# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### SOUTHERN DIVISION

#### No. 7:10-CV-00247-D

| | | |
|---|---|---|
| RITA E. NORRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM &** |
| | ) | **RECOMMENDATION** |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the Court upon Plaintiff's motion for judgment on the pleadings (DE-36) and Defendant's motion for judgment on the pleadings (DE-38). Plaintiff responded to Defendant's motion for judgment on the pleadings (DE-41), and Defendant replied (DE-42). Plaintiff responded to Defendant's reply. (DE-43). The time for the parties to file any further responses or replies has expired. Accordingly, the matter is now ripe for adjudication. Pursuant to 28 U.S.C. § 636(b)(1), this matter has been referred to the undersigned for the entry of a memorandum and recommendation. For the following reasons, it is RECOMMENDED that Plaintiff's motion for judgment on the pleadings (DE-36) be DENIED, that Defendant's motion for judgment on the pleadings (DE-38) be GRANTED, and that the final decision by Defendant be AFFIRMED.

### I.   STATEMENT OF THE CASE

Plaintiff applied for a period of disability and disability insurance benefits on September

1

15, 2008, alleging that she became unable to work on May 5, 2008 due to degenerative cervical and lumbar disease. (T.pp.156-58, 179). Her application was denied initially and upon reconsideration. (T.pp.59-62, 69-71). An Administrative Law Judge ("ALJ") held a video hearing on the matter February 2, 2010, during which a vocational expert ("VE") testified. (T.pp.7-36, 42). In a decision dated February 18, 2010, the ALJ determined Plaintiff was not disabled. (T.p.42-51). The Social Security Administration's Office of Disability Adjudication and Review ("Appeals Council") denied Plaintiff's request for review on November 1, 2010, rendering the ALJ's determination as Defendant's final decision. (T.pp.1-3). Plaintiff filed her complaint with this Court on February 18, 2011. (DE-5).

## II.  DISCUSSION

### A.  Standard of Review

This Court is authorized to review Defendant's denial of benefits under 42 U.S.C. § 405(g), which provides in pertinent part:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.

"Under the Social Security Act, [the court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence is . . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368

2

F.2d 640, 642 (4th Cir. 1966). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." Craig, 76 F.3d at 589. Thus, this Court's review is limited to determining whether Defendant's finding that Plaintiff was not disabled is "supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990).

The Social Security Administration has promulgated the following regulations establishing a sequential evaluation process to determine whether a claimant is entitled to disability benefits:

> The five step analysis begins with the question of whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App.I. If so the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work. 20 C.F.R. § 404.1520(f).

Mastro v. Apfel, 270 F.3d 171, 177 (4th Cir. 2001).

## B. ALJ's Findings

In the instant action, the ALJ employed the sequential evaluation. First, the ALJ found that Plaintiff is no longer engaged in substantial gainful employment. (T.p.44). At step two, the ALJ found that Plaintiff suffers from a severe impairment, degenerative disc disease. (T.p.44). However, the ALJ determined that her impairment was not severe enough to meet or medically equal one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. (T.p.46). Based on the record as a whole, the ALJ determined that Plaintiff had the residual functional capacity

3

("RFC") to perform light work with a number of restrictions. (T.p.46).

The ALJ then proceeded with step four of his analysis and determined that Plaintiff could no longer perform her past relevant work as a home health care attendant. (T.p.49). However, relying upon the testimony of the VE and information contained in the *Dictionary of Occupational Titles* ("DOT"), the ALJ found that Plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (T.p.51). Based on these findings, the ALJ determined that Plaintiff was not disabled. (T.p.51). The ALJ's findings were based upon the following evidence in the record.

## C. **Plaintiff's Testimony and Other Evidence of Record**

Plaintiff testified that her date of birth is November 2, 1965, which made her forty-two years old at the time of the alleged onset of her disability. (T.p.12). Plaintiff did not complete the ninth grade, but she attended Sampson Community College and obtained a Certified Nursing Assistant ("CNA") license. (T.p.13). Plaintiff worked as a CNA in the home health care industry for at least fifteen years. (T.p.15). As a CNA, Plaintiff visited patients in their homes in order to "give baths, check vital signs, cook, and clean for them, [and do] their grocery shopping," among other tasks. (T.p.15).

Plaintiff described various physical problems impeding her ability to work. First, Plaintiff has "sharp pains in [her] lower back [that] feel[] like they're squeezing bones together." (T.pp.15-16). She wears a lower lumbar back brace prescribed by her primary physician. (T.p.14). She also experiences pain throughout the entire right side of her body, along with tingling in her legs that Plaintiff compared to "little sharp pins sticking in [her] feet." (T.p.16). Next, Plaintiff has residual pain in her neck where she had surgery to replace several discs. (T.p.16). Despite the surgery, the pain in her neck is "still like a vice" and sometimes prevents her

4

from holding up her head; she must "let it fall down because it's hurting." (T.pp.16, 28). Her neck pain causes severe headaches "[a]t least every other day." (T.p.28). These headaches force Plaintiff "to go to bed just to get rid of the headache." (T.p.28). Finally, Plaintiff has intense "grinding" pain in her shoulders "like a toothache that won't go away even when [she] take[s] [her] medicine." (T.p.16). Plaintiff reported taking the following medications three times a day: Percocet 10, Flexeril, Tramadol, and Xanax. Plaintiff also takes Quinapril, Toprol, and HCTZ every day, as well as medication for cholesterol and diabetes whose names she could not recall. (T.pp.17-18). Due to her constant pain, Plaintiff does not believe she can work. (T.p.22).

In addition to her pain, Plaintiff suffers from daily anxiety attacks. The anxiety attacks manifest suddenly, with no warning, and create a "compression weird pain in [Plaintiff's] chest." (T.p.26). The symptoms go away when Plaintiff takes her medication.

Plaintiff lives in a mobile home with her eighteen-year-old daughter. On a typical morning, Plaintiff "fix[es] [herself] a sandwich or some cereal," takes her pain medications, watches television, and takes her dog outside. (T.p.19). She attempts "to do a little something, but it's not a whole lot." (T.p.19). For example, "[i]f there's a few dishes in the sink, [Plaintiff] will try to wash them if it [will only] take . . . a few minutes." (T.p.19). Plaintiff owns "a little vacuum cleaner" and "tr[ies] to dust, to vacuum just a little bit." (T.p.21). She sometimes does light shopping. (T.p.21). On most days, she leaves her home to "go downtown and check [her] mail at the post office." (T.p.26). She is able to drive but avoids long distances because of her neck pain. (T.p.21). She usually eats a sandwich for lunch, then takes her medication and lies back down for the afternoon. A friend occasionally visits her. (T.p.21). In the evening, Plaintiff prepares a light supper, watches the news, and reads "for a few minutes." (T.p.20). She goes to bed between seven and eight o'clock, depending on her pain level. Once in bed, Plaintiff

5

turns her electric blanket or heating pad "on high because [her] bones . . . ach[e] so bad[ly]," even after taking medication. (T.p.20). Plaintiff estimated that she spends eighteen hours per day either sleeping or lying down. (T.p.25).

Plaintiff stopped going to the pain clinic for treatment because she "didn't have the money . . . to go down there to have it done." (T.p.30). Plaintiff's only health insurance is Medicaid. (T.p.30). In addition, the treatments "didn't help [her] before" and thus Plaintiff had no confidence the treatments will offer future benefit. (T.p.30).

Vocational expert Andrew Pasternak testified that Plaintiff's past work as a home health care attendant was semi-skilled and required varying physical exertion levels ranging from light to heavy, with the resulting average exertion level of medium. (T.p.32). The ALJ posed the following hypothetical:

> [A]ssume somebody who can perform light work, but never climb ladders, ropes or scaffolds, and can occasionally reach overhead with their . . . arms. Assuming the same age, education, and work experience as [Plaintiff], are there any jobs that exist in the regional or national economy that such a person could perform?

(T.pp.32-33). Mr. Pasternak replied that "there certainly [were] quite a range of other jobs" such an individual could perform, including light assembly, sales attendant, and hand packer, and he verified that these positions existed in significant numbers in the local and regional labor markets. (T.p.33). The ALJ further asked whether jobs existed for "an individual who's limited to sedentary work, can never climb ladders, ropes, or scaffolds but, but can occasionally perform other postural movements." (T.p.33). Mr. Pasternak identified the positions of telemarketer and order clerk as sedentary positions available to such an individual in Plaintiff's region. (T.p.34). However, if this hypothetical person had only a "limited ability to do any fingering or handling,"

6

"need[ed] to take breaks at will" away from the work station, and would "be absent from work more than once a week for whatever reason," Mr. Pasternak believed these restrictions would preclude employment.   (T.pp.34-35).

The medical evidence supporting Plaintiff's claim is summarized in pertinent part as follows:

From 1996 through 1998, Plaintiff experienced episodes of lower back pain.   (T.p.319). She was treated with injections at Southeastern Orthopedics.   (T.p.408).   In March of 2006, Plaintiff was involved in a go-cart accident.   The go-cart flipped over and impacted her neck and right shoulder.   (T.p.408).   After the accident, Plaintiff began experiencing intermittent neck pain accompanied by numbness and tingling in her right arm, as well as renewed pain in her lower back.   Physical therapy and traction for her neck pain only worsened her symptoms.   (T.pp.408, 510).

Plaintiff underwent a stress echocardiogram at Cape Fear Cardiology Associates, P.A. on October 19, 2006.   Although the results were difficult to interpret, no significant abnormalities were identified.   (T.p.231).

On March 26, 2007, Plaintiff visited Carolina Pines Community Health Center complaining of numbness and tingling in her arms, hands, legs and feet.   (T.p.309).   Plaintiff was assessed with paresthesia, prescribed Neurontin, and referred to a neurologist.   For the muscle spasms in her neck, Plaintiff received a prescription for Skelaxin.   (T.p.310).   When Plaintiff called the health center the following day and reported being unable to afford the prescription for Skelaxin, another medication was substituted.   (T.p.313).

Plaintiff sought treatment from Jamie T. Floyd, PA-C, on June 6, 2007 for shoulder and neck pain with associated numbness in the hands and fingers.   (T.p.279).   Plaintiff related that

7

she had to miss her appointment with a neurologist that day because she could not afford it and requested a different neurologist who would "not have an upfront fee." (T.p.279). Plaintiff obtained a refill of her medications and was advised that "most neurologist[s] are going to ask for a co-pay or fee." (T.p.279).

Plaintiff's pain in her shoulder, neck and back continued to worsen. (T.p.469). After several days of intense pain, Plaintiff sought medical care from Sherry Secrest, PA-C, on July 2, 2007. She related that "she had multiple accidents on four wheelers and other recreational vehicles" and "was seen in the past for this, but denie[d] any broken bones or problems with that." (T.p.469). Plaintiff stated she could not afford to see a neurologist and wanted medications for her pain. She was diagnosed with right shoulder strain and given several medications. At a follow-up visit on July 23, 2007, Plaintiff reported that the medication had helped her symptoms and denied any numbness, weakness or tingling in the right extremity. (T.p.468). She had good range of motion, good sensation, and ambulated without difficulty. When discussing further treatment options, Plaintiff related that she was "limited financially and would like to find something that would not constrain her financially." (T.p.468). At a second follow-up visit on September 4, 2007, Plaintiff's neck and right shoulder pain continued. Upon examination, she had good strength in the right extremity, good range of motion and sensation, but discomfort with external rotation and adduction. (T.p.510). Her neck had "good range of motion and good strength with mild discomfort with range of motion activities." (T.p.510).

Allyn B. Dambeck, M.D., obtained an MRI of Plaintiff's cervical, thoracic, and lumbar spine on September 6, 2007 at Sampson Regional Medical Center. (T.p.331). The MRI of her cervical spine showed "multilevel disc protrusions with significant spinal stenosis," particularly at the C6-7 level. Plaintiff's thoracic and lumbar MRIs were unremarkable.

8

At a September 11, 2007 visit with her primary physician, W. Richard Schmits, MD, FAAFP, Plaintiff complained of "poor control" in her left foot, which sometimes dragged. Upon examination, she had weakness in her left upper and lower extremities. (T.p.509). She also had weakness on dorsiflexion, plantar flexion, and quadriceps function on the left side. Her back showed good range of motion, and she was "able to squat down and get[] up without too much difficulty." (T.p.509).

On October 25, 2007, Plaintiff visited Tedman L. Vance, M.D., at the Huff Orthopaedic Group, P.A. for the pain in her right shoulder and neck. (T.pp.240, 243). Plaintiff described her pain as "sharp, throbbing, numbness, tingling and aching with a value of 9/10." (T.p.240). Upon examination, Plaintiff's head and neck were normal with a "[f]ull, painless range of motion of the neck" with normal stability, strength and tone. (T.p.242). A straight leg raising test showed no instability. Dr. Vance diagnosed Plaintiff with radiculitis, prescribed a Medrol dose pack, and advised her about rest, ice and elevation. (T.p.242). Plaintiff was also referred to George V. Huffmon, III, M.D. at Atlantic Neurosurgical & Spine Specialists, P.A., for consultation on her neck pain. (T.p.408).

Dr. Huffmon examined Plaintiff on November 12, 2007 and found that her "[c]ervical range of motion [was] decreased in extension and laterally and accompanied by pain." (T.p.409). Her motor strength was 5/5 in her upper and lower extremities. (T.p.409). She had decreased sensation in her right medial and posterior lower extremity, a negative straight leg raise, and was "[t]ender with palpation of her lumbar facets and SI joints bilaterally and her right trochanteric bursa." (T.p.409). Plaintiff informed Dr. Huffmon that in addition to her neck and back pain, she occasionally suffered from cerviocogenic and frontal headaches. (T.p.408). Dr. Huffmon noted that her MRI revealed multiple levels of degenerative disc disease in her cervical spine and a

9

"large right paracentral herniated disc at C3-4." (T.p.409). Dr. Huffmon diagnosed her with sacroilitis, cervical degenerative disc disease, and a herniated disc. He opined that Plaintiff "may need some surgery" but wanted to first attempt conservative therapy. (T.p.409).

Dr. Huffmon ordered a lumbar and cervical myelogram and post myelogram CT, which was performed on December 6, 2007 at New Hanover Regional Medical Center. (T.p.341). With regard to her lumbar spine, the procedures revealed mild degenerative disc disease at L3-L4, but no disc herniation, significant spinal stenosis, or nerve root impingement at any level. (T.p.342). At L4-L5, there was disc bulge but no spinal stenosis. In the cervical spine, Plaintiff showed degenerative disc disease and severe spinal stenosis at C3-C4 and C4-C5, and most markedly at C5-C6, causing a mass-effect on the right C4, bilateral C5 and bilateral C6 nerve root sleeves. (T.p.343). The post myelogram CT of the cervical spine revealed spondylosis at C3-C4, C4-C5, and C5-C6, as well as "disc-osteophytic complexes resulting in flattening of the cord at these three levels." (T.p.344).

Dr. Huffmon referred Plaintiff to John H. Knab, M.D., at the Center for Pain Management for consultation on December 10, 2007. (T.p.319). Plaintiff reported neck, shoulder, arm, back, hip, and leg pain. Plaintiff described her pain as "burning and aching in nature and also throbbing" with a severity level ranging from an 8/10 to a 10/10. (T.p.319). Plaintiff's pain improved with the application of heat and lying down and worsened with sitting, walking, standing, lying, driving, lifting, bending, twisting, and getting up from a seated position. For pain control, Plaintiff took Vicodin.

Reviewing Plaintiff's radiographic records, Dr. Knab noted that her CT myelogram from December 6th showed "C3-4 disc osteophyte complex, asymmetric towards the right resulting in flattening of the right aspect of the cord with mass effect on the right C4 nerve root." (T.p.319).

10

Plaintiff also had a "C6-7 disc bulge without spinal stenosis." Her MRI of the cervical spine "suggest[ed] more of a right-sided spinal stenosis at C6-7" and was "negative for any significant findings in the lumbar spine in terms of central canal or foraminal stenosis." (T.p.319). Upon physical examination, Plaintiff's "[m]otor strength [was] 5/5 in the bilateral iliopsoas, quadriceps femoris, biceps femoris, gastrocnemius and anterior tibialis, deltoid, biceps, triceps, wrist flexors, wrist extensors and grip." (T.p.319). Her sensation was intact. She had "tenderness to palpation over the right sacroiliac joint with positive Patrick's sign" as well as a positive straight leg raise present at 30 degrees. (T.p.320). Dr. Knab diagnosed Plaintiff with "[c]ervical radiculopathy on the right due to either C3-4 disc or C6-7 disc" and believed a C4 nerve root block would help her. He further opined that a "sacroiliac would help quite a bit" for the pain in her lower back and leg. However, because she had recently lost her Medicaid benefits, Plaintiff wanted to wait until her benefits were reinstated before she proceeded with any injections. (T.p.320).

On March 24, 2008, Plaintiff visited Clarence Faulcon, M.D. complaining of chest pain. (T.p.277). Dr. Faulcon believed that Plaintiff's reflux was causing her chest pain and prescribed Protonix daily for the condition. Her examination was otherwise normal, with no tenderness in her neck. (T.p.277).

Plaintiff met with her primary physician, Dr. Schmits, on April 18, 2008 to discuss her neck pain. Plaintiff informed Dr. Schmits that she "lifted her shoulder up at work and had pain in the shoulder going down to the trapezius." (T.p.444). Dr. Schmits noted that Plaintiff had been unable to get repeat cortisone shots because she did not have insurance. Upon examination, Plaintiff had "fairly good range of motion" in her neck but "some tenderness in the right trapezius." (T.p.444). Her hands showed no numbness, and her grasp strength, biceps, triceps,

and deltoids were normal. (T.p.444). Dr. Schmits refilled her prescription for Percocet and restricted her to working only four hours a day.

Plaintiff returned to work part-time, then full-time, but continued to have trouble whenever she raised her arms. (T.p.443). Dr. Schmits refilled her Percocet prescription on May 7, 2008 and recommended she not work until he saw her again in three weeks. (T.p.443). Plaintiff returned to Dr. Schmits on May 28, 2008 and June 25, 2008 for refills of her pain medication. (T.pp.441-42).

Plaintiff visited Dr. Knab for injectional therapy on July 24, 2008. (T.p.318). Dr. Knab also performed an epidurogram, which revealed no intraspinal abnormalities and normal spinal alignment. (T.p.322). Most of Plaintiff's pain was in her right neck, shoulder, and arm. Dr. Knab noted a "number of different radiographic abnormalities on her CT myelogram and radicular component of her pain does not specifically speak to a C4, C5, or C7 radiculopathy. It may in fact be a combination of these." (T.p.318). Because of the difficulty of locating the source of Plaintiff's pain, Dr. Knab decided that, "rather than pursuing a specific nerve root level at this point in time, [he] offered [Plaintiff] a transliminar epidural steroid injection with a right-sided angulation towards the lateral recess so as to target multiple nerve roots at once." Plaintiff agreed, and Dr. Knab performed the procedure. At discharge, Plaintiff reported that her pain level was "2/10." (T.p.318).

On July 25, 2008, Plaintiff saw Dr. Schmits, who approved her to work half days, five days a week, with the restriction of no lifting over fifteen pounds. (T.p.437). On July 31, 2008, Plaintiff returned to Dr. Schmits and reported she was unable to work. (T.p.437). Dr. Schmits decided that she should have a neurosurgical consultation and cleared her from working until the neurosurgeon approved. (T.p.437).

12

Plaintiff received additional injectional therapy from Dr. Knab on August 25, 2008. (T.p.317). At that time, he administered a transforaminal epidural steroid injection at Plaintiff's C6 root for her neck and shoulder pain. (T.p.317). Dr. Knab noted that Plaintiff's CT and MRI showed nerve root compression at C6 and C4. Plaintiff reported having no relief with the earlier translaminar epidural at C5-6, but wished to proceed with the injection. (T.p.317). Following the procedure, Dr. Knab advised Plaintiff to keep a pain diary, and he scheduled a repeat injection in three weeks' time. (T.p.317).

At a follow-up appointment with Dr. Huffmon on September 26, 2008, Plaintiff stated that the steroid injection had provided "only 20-25% relief." (T.p.412). Plaintiff reported decreased strength in her right hand accompanied by numbness and tingling in her thumb and index finger, decreased range of motion in her cervical spine, and more pain in her right shoulder than her left. Her physical examination confirmed a decreased cervical range of motion accompanied by pain. Her motor strength was 5/5, except for her left triceps, which was 4+/5. Her sensation was symmetric and intact. Dr. Huffmon discussed with Plaintiff the risks and benefits of possible surgery. Plaintiff indicated she would "think about it and get back to [him]." (T.p.412). Dr. Huffmon noted that if Plaintiff decided to proceed with surgery, she would need an updated MRI. (T.p.412).

Plaintiff underwent a second MRI on December 2, 2008. (T.p.345). The findings were "similar in severity to that noted on the prior myelo[gram] CT." (T.p.345). The interpreting physician diagnosed "multilevel central stenosis at C3/4, C4/5, and C5/6 due to a combination of congenital and acquired features" as well as "cord flattening . . . at these levels with intrasubstance cord signal abnormality in conjunction with changes at the C5/6 level." (T.p.346). There was also "small right posterolateral protrusion of disc and osteophyte at C6/7 with minimal right C7

13

root mass-effect." (T.p.346). Otherwise, the physician observed "at other levels, no disc herniation, root placement, canal narrowing, or foraminal narrowing."

After the MRI was completed, Plaintiff again consulted Dr. Huffmon as to possible surgical options for her back pain. Dr. Huffmon noted that Plaintiff's cervical MRI showed "C3-4, 4-5, 5-6 stenosis due to disc bulge, herniated disc and bone spurs." (T.p.406). The diagnosis was multilevel cervical spondylosis and stenosis. Dr. Huffmon discussed with Plaintiff the risks and benefits of an anterior cervical discectomy and fusion. Plaintiff indicated she wished to proceed. (T.p.406).

On December 22, 2008, Plaintiff sought treatment with Dr. Schmits for lower back pain. (T.p.451). Dr. Schmits noted that Plaintiff's back pain was accompanied by weakness in the left lower extremity. Plaintiff informed Dr. Schmits that she sometimes stumbled when she walked. Examination of her back revealed "some tenderness" and "85% flexion." (T.p.451). Dr. Schmits refilled her prescription for oxycodone and also gave her Flexeril.

Plaintiff was admitted to New Hanover Regional Medical Center on December 29, 2008 for an anterior cervical discectomy and fusion of the cervical bone. (T.p.354). The procedure went well, and Plaintiff was discharged the following day. (T.p.354).

On January 29, 2009, Plaintiff returned to Dr. Huffmon for her first post-operative appointment. Plaintiff had pain in her neck and right arm, numbness and tingling, but believed it "was getting better than it was preoperatively." (T.p.416). Plaintiff reported that her prescription for Skelaxin did not help, but Flexeril did. She had "decreased but appropriate range of motion in all planes" of her cervical spine. (T.p.416). Her incision was well healed and she had good muscle tone and bulk. Her motor strength was 5/5 and her sensation was intact in the bilateral upper extremities. Dr. Huffmon found her to be "doing well" and gave her a note to stay

14

out of work until her next appointment in four weeks' time.   (T.p.416).

Dr. Schmits also found Plaintiff "doing fairly well" at a January 30, 2009 appointment. (T.p.479).   He noted that her "back x-ray showed minimal degenerative change" with "no acute bony abnormality."   (T.p.479).

Medical consultant Margaret Parrish, M.D. completed a physical residual functional capacity assessment of Plaintiff on February 6, 2009 and found her capable of the following physical activity:   occasionally lifting twenty pounds; frequently lifting ten pounds; standing and/or walking with normal breaks for a total of six hours in an eight-hour workday; sitting with normal breaks for a total of about six hours in an eight-hour workday; and unlimited pushing and pulling.   (T.pp.385-91).   Dr. Parrish believed Plaintiff could frequently climb ramps or stairs, balance, stoop, kneel, crouch and crawl, but could never climb ladders, ropes or scaffolds. (T.p.386).   Plaintiff was also limited in her ability to reach overhead.   (T.p.387).

At her second post-operative follow-up with Dr. Huffmon on February 26, 2009, Plaintiff complained of continuing right shoulder and arm pain, which she felt was "slightly worse." (T.p.414).   She also had continued numbness and tingling in her right arm, and pain in her right leg.   The flexion and extension x-rays of her cervical spine showed "no significant motion," (T.p.414) with intact hardware, solid fusion, and anatomical alignment.   (T.pp.428-29).   She had good muscle tone and bulk, normal gait, full muscle strength and reflexes, and intact sensation. Dr. Huffmon believed Plaintiff was "doing relatively well" despite her shoulder pain.   (T.p.414). He prescribed Neurontin and ordered physical therapy.

Plaintiff exhibited a "good range of motion" in her back during a February 27, 2009 visit with Dr. Schmits.   (T.p.478).   Her upper extremities also showed "fairly good range of motion" with a "slight decreased grasp strength" in her right hand.   (T.p.478).   Plaintiff reported

15

"sleeping rather erratically."  She requested a "no work slip" until June 25, 2009, which Dr. Schmits gave her.

Plaintiff returned to Dr. Vance on March 9, 2009 for continued pain in her right shoulder despite the cervical discectomy.  (T.p.245).  Upon examination, Dr. Vance noted that Plaintiff's surgical incision was healing without complication.  The range of motion in her right shoulder was mildly limited with a positive impingement sign.  (T.p.246).  There was also subacromial tenderness to palpation and tenderness to palpation over the AC joint.  Dr. Vance treated Plaintiff with a cortisone injection and told her to return in three months.  (T.p.246).

At a March 27, 2009 appointment, Plaintiff told Dr. Schmits the cortisone injection had "felt good for a couple of hours" but then the pain returned.  (T.p.476).  Dr. Schmits noted she had decreased range of motion in her neck and would be starting physical therapy soon.

A psychiatric review of Plaintiff's anxiety-related disorder completed February 13, 2009 found no severe impairment.  (T.p.392).  Plaintiff had mild limitations in maintaining social functioning and concentration, persistence, or pace.  (T.p.402).  A second psychiatric review dated June 1, 2009 found only mild restriction in activities of daily living.  (T.p.525).

At physical therapy in April, Plaintiff exhibited "significant loss of motion in her [cervical spine] in all directions" accompanied by decreased strength of the cervical spine muscles. (T.p.574).  She reported having pain on a scale of "8/10 . . . at rest and . . . when she is active the pain increases to 10/10."  (T.p.574).  Plaintiff missed several physical therapy visits in April and May due to back pain.  (T.pp.568-69).  Plaintiff eventually decided to discontinue physical therapy because of the pain it caused her neck.  (T.p.570).

Perry Caviness, M.D., completed a second physical residual functional capacity assessment of Plaintiff on June 4, 2009.  (T.pp.539-546).  Upon reviewing the medical record,

16

Dr. Caviness believed Plaintiff capable of the following physical activity: occasionally lifting twenty pounds; frequently lifting ten pounds; standing and/or walking with normal breaks for a total of six hours in an eight-hour workday; sitting with normal breaks for a total of about six hours in an eight-hour workday; and limited pushing and pulling in the upper extremities. (T.p.540). Dr. Caviness found Plaintiff could frequently stoop, kneel, crouch and crawl, and occasionally balance and climb ramps, stairs ladders, ropes, and scaffolds. (T.p.541). Plaintiff was limited in her ability to reach overhead. (T.p.542). Dr. Caviness noted that Plaintiff's "[a]llegations about symptoms and functional limitations appear credible, *currently*." (T.p.546). However, Dr. Caviness observed, Plaintiff was still recovering from her surgery and he expected her condition to continue to improve.

Dr. Schmits prescribed a lumbosacral back brace for Plaintiff in June of 2009. (T.p.585). Generally, he believed she was "doing fairly well." (T.p.585). At a June 25, 2009 follow-up with Dr. Huffmon, Plaintiff complained of "increasing neck pain, posterior neck pain, right arm pain and right shoulder pain, numbness and tingling." (T.p.547). She also had pain in her lower back and right leg. Her examination revealed "[a]ppropriate decreased range of motion in all planes" of her cervical spine and "suboccipital cervical tenderness and lumbar paravertebral tenderness and bilateral SI joint tenderness and right-sided straight leg raising." (T.p.547). She had good muscle tone and bulk. Her motor strength was "5/5 in bilateral upper and lower extremities" with intact sensation. Her reflexes were "2+ in bilateral upper and lower extremities except 3+ left patellar." Flexion/extension x-rays showed "no significant motion." Dr. Huffmon scheduled an MRI and a follow-up visit.

The MRI performed August 5, 2009 showed minimal disc bulge at L3-L4 and mild degenerative change at the L5-S1 facet complex on the left with no significant foraminal

narrowing. (T.p.591). With regard to her cervical spine, the MRI revealed anterior cervical fusion C3 through C6 due to her surgery, and "broad marginal osteophytosis at C5-C6 with mild diffuse ventral cord flattening." (T.p.593). There was also a "shallow right paracentral disc/osteophyte protrusion at C4-C5 mildly abu[tting] the right ventral cord margin" causing "slight flattening of the right ventral cord margin at C3-C4." (T.p.593).

At a September 30, 2009 visit with Dr. Schmits for pain medication, Plaintiff had "excellent range of motion" in her back. (T.p.577).

Plaintiff returned to Huff Orthopaedic Group on October 19, 2009 for a cortisone injection. (T.pp.549-50). Plaintiff reported that the injections helped for about ten to fifteen days. During examination, Plaintiff experienced pain upon active flexion, extension, active internal rotation, and passive internal rotation of her right shoulder. There were signs of positive impingement. (T.p.550). She had normal muscle strength and tone.

Plaintiff returned to Dr. Huffmon on October 29, 2009 for follow-up on her MRI. (T.p.552). Plaintiff had good muscle tone and bulk, with "suboccipital cervical, thoracic and lumbar paravertebral tenderness and bilateral SI joint tenderness." (T.p.552). Straight leg raising bilaterally increased her neck pain. Her motor strength was "5-/5 left biceps, triceps and left knee flexion/extension; otherwise 5/5." Plaintiff had decreased sensation circumferentially in her right upper and right lower extremities. Her reflexes were 2+ in bilateral upper and lower extremities. Dr. Huffmon noted that the updated MRI showed a "residual right C3 osteophyte" which was "smaller than it was previously" but he was "not sure that is causing any of her symptoms" because "[s]he should be fused there." (T.p.552). Dr. Huffmon referred Plaintiff to the pain clinic for a selective nerve block on the right at C3-4.

Dr. Huff at Huff Orthopaedic Group treated Plaintiff on December 15, 2009 for her

18

continued right shoulder pain.   Plaintiff described her pain as dull, aching and intermittent, at a

5/10 grade.   (T.p.554).   Upon examination, Plaintiff experienced pain in her right shoulder

during active abduction, internal rotation, and flexion.   She had a positive Hawkin's sign and a

positive impingement sign.   (T.p.555).   She had normal muscle strength and tone.   At a

follow-up visit on December 23, 2009, Plaintiff had pain with active flexion and abduction, but

extension and external rotation was full and painless.   (T.p.558).   She had a positive Hawkin's

sign, but she was negative for impingement.   She had normal muscle strength and tone.

     Further facts are set out as necessary in evaluating Plaintiff's arguments.

## III.   <u>ANALYSIS</u>

     Plaintiff argues the ALJ (1) improperly evaluated her credibility and the medical record,

resulting in an RFC unsupported by substantial evidence; (2) erred in relying on the opinion of a

non-examining medical consultant regarding impairment severity; and (3) erred in finding that

Plaintiff's severe spinal stenosis did not meet the criteria of Listing 1.04.   The undersigned

concludes there was substantial evidence to support each of the ALJ's determinations.   Moreover,

the ALJ properly considered all relevant evidence, including the evidence favorable to Plaintiff,

weighed conflicting evidence, and fully explained the factual basis for his resolutions of conflicts

in the evidence.   Plaintiff's arguments rely primarily on the contention that the ALJ improperly

weighed the evidence.   However, this Court must uphold Defendant's final decision if it is

supported by substantial evidence.   Although Plaintiff may disagree with the determinations

made by the ALJ after weighing the relevant factors, this Court does not re-weigh conflicting

evidence, make credibility determinations, or substitute its judgment for that of the Secretary.

<u>Craig</u>, 76 F.3d at 589.   Because that is what Plaintiff essentially requests this Court do, her claims

lack merit.   The undersigned will nonetheless address Plaintiff's specific assignments of error.

A. **The ALJ properly assessed Plaintiff's credibility**

Plaintiff challenges the ALJ's determination regarding the credibility of her testimony. The ALJ found that while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," Plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms [were] not credible to the extent they [were] inconsistent" with the RFC assessment. (T.p.47). The ALJ explained that, with regard to Plaintiff's back and neck pain, the objective medical evidence did not support the degree of limitation alleged. The Fourth Circuit has noted that

> [a]lthough a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers[.]

Craig, 76 F.3d at 595.

Here, the ALJ found that

> [t]he medical evidence establishes that the claimant has been diagnosed with a back disorder and underwent surgery to repair damage to her cervical spine (Exhibit 10F). While pre-surgical images of the claimant's cervical spine showed degenerative disc disease and severe stenosis, post-surgical studies showed the claimant's surgical hardware is intact with good alignment (Exhibits 10F, 13F). A myelogram and CT scan of the claimant's lumbar spine showed mild degenerative disc disease with mild disc space narrowing and anterior osteophytes, but no disc herniation, significant stenosis, or nerve root impingement (Exhibit 10F).
>
> Physical examinations of the claimant showed normal muscle tone and gait (Exhibit 13F). The claimant retains full strength in her extremities as well as normal, symmetric reflexes. Postsurgical examinations of the claimant indicated that her pain, numbness, and tingling have improved with surgery. Examinations of the claimant also showed a decreased range of motion in her cervical spine, as well as tenderness along her spinal muscles (Exhibit 23F). The claimant has been prescribed a lumbar back brace and a recent examination showed an "excellent" range of motion in her back (Exhibit 21F, p.2).
>
> Examinations of the claimant also showed a mildly limited range of motion in her right shoulder (Exhibit 4F). The claimant exhibited tenderness to palpation and was treated with nerve block injections. While the record indicates that an

MRI of the claimant's shoulder was "read as positive," (Exhibit 4F, p.3) there are no objective findings to indicate joint space narrowing, bony deformity, or other severe disorder of the claimant's shoulder. Similarly, there are no objective findings to support hip or knee disorders, nor is there a pattern of treatment for the claimant's alleged frequent headaches. Though the claimant testified that she was limited in her ability to seek medical treatment due to a lack of medical insurance, the undersigned notes that there is no record of emergency department visits or other indication that the claimant has sought urgent care for what she claims are severe, disabling symptoms.

(T.pp.47-48).

The ALJ further concluded that the evidence with regard to Plaintiff's daily activities did not support the degree of limitation she alleged:

At the hearing, the claimant testified that she is able to dress herself and care for her personal hygiene. The claimant further testified that she is able to prepare simple meals and perform light household chores such as vacuuming and washing dishes. The claimant also testified that she is able to shop for lighter items, can take her dog out daily, and travels to the post office regularly to check her post office box. According to the claimant, she reads and watches television for entertainment and has a friend from a neighboring town come to visit. The claimant's sister stated that she also visits several times weekly, in addition to regular phone conversations (Exhibit 7E). The claimant has been prescribed a back brace for support and testified that she sits, stands, and walks for a few hours each day.

The claimant testified to an active daily routine which includes caring for her personal needs and attending to tasks with minimal, if any, outside assistance. The claimant is able to leave her home unaccompanied, socialize, and help care for a pet. The claimant's testimony indicates that she retains the ability to perform a wide range of activities and is consistent with the residual functional capacity for light work.

According to Plaintiff, the ALJ hinged his credibility analysis on three faulty assertions of fact: (1) that the bulk of the evidence demonstrates that her condition improved following the surgery on her neck; (2) that her testimony indicates she can perform a wide range of activities consistent with her RFC; and (3) that the scarcity of her emergency room visits undercuts her allegations of debilitating pain. On the contrary, Plaintiff asserts the evidence demonstrates her surgery in December 2008 did not significantly improve her condition and points to medical

21

documentation of her continued cervical spine pain throughout 2009. With regard to her daily activities, Plaintiff accuses the ALJ of "embellishing" her statements and failing to "analyze the entirety of her testimony." (DE-37, p.11). For example, the ALJ's finding that she was "able to prepare simple meals" glosses over Plaintiff's stated inability to lift a frying pan in order to cook heavier fare. She contends that the evidence as a whole shows that she "hardly leads the 'active' lifestyle described by the ALJ." (Id.). Plaintiff also takes issue with the ALJ's finding that there was "no pattern of treatment for the claimant's alleged frequent headaches" and "no record of emergency department visits or other indication that the clamant has sought urgent care for what she claims are severe, disabling symptoms." (T.p.48). Plaintiff submits that she has a long medical history demonstrating that she consistently sought medical attention whenever she was financially able to do so. In short, Plaintiff contends the ALJ's credibility analysis is unsupported by the evidence of record. The undersigned disagrees.

The detailed findings of fact demonstrate that the ALJ gave proper weight to all of Plaintiff's limitations and impairments in assessing her credibility. Likewise, the ALJ's citations to Plaintiff's medical records constitute substantial evidence supporting his assessment. The ALJ determined that Plaintiff's subjective complaints were inconsistent not only with her activities of daily living, but with the objective medical evidence. For example, the ALJ noted that physical examinations in 2009 showed normal muscle tone and gait, full strength in her extremities, and normal symmetric reflexes. The August 5, 2009 MRI showed only minimal disc bulge at L3-L4 and mild degenerative change at the L5-S1 facet complex on the left, with no significant foraminal narrowing. (T.p.591). Dr. Huffmon noted that the MRI showed a "residual right C3 osteophyte" which was "smaller than it was previously" but he was "not sure that is causing any of her symptoms" because "[s]he should be fused there." (T.p.552). Dr. Schmits' examination on

September 30, 2009 showed excellent range of motion in her back. This objective medical evidence undermines Plaintiff's assertions of her limitations and supports the ALJ's determination that she is capable of performing light work with certain restrictions. And although Plaintiff objects to the characterization of her lifestyle as "active," her own testimony established that she independently attends to her personal needs and household tasks. She can dress, bathe, and prepare light meals without assistance. She cares for her dog, regularly drives short distances, and visits with friends and family. While this lifestyle may not be as "active" as others, it nevertheless demonstrates that Plaintiff is capable of activity consistent with her RFC as found by the ALJ. Finally, the ALJ properly noted that the medical record contains no pattern of treatment for Plaintiff's alleged severe headaches. Although the medical record contains sporadic references to complaints by Plaintiff of headaches, there is no consistent medical evidence to support Plaintiff's assertion of a debilitating condition. Because the medical record contains so few references to her alleged disabling headaches, the ALJ could properly conclude that Plaintiff's complaints were inconsistent with other objective evidence of record.

Because the ALJ provided sufficient reasons for finding Plaintiff's subjective complaints not fully credible, this Court must defer to ALJ's adverse credibility determination. Craig, 76 F.3d at 595-96 (citing 20 C.F.R. § 416.929(c)(4)). As the ALJ properly conducted his credibility determination, which is supported by substantial evidence of the record, Plaintiff's assignment of error lacks merit and is overruled.

**B. The ALJ properly relied on the medical consultant's opinion**

Plaintiff argues the ALJ erred in relying upon the opinion offered by Dr. Parrish as to her RFC because the assessment was performed in February 2009, only two months after her surgery. Because Dr. Parrish did not review the entire medical record before making her recommendation,

23

Plaintiff contends the RFC assessment was flawed and should not have been given significant weight by the ALJ. However, Plaintiff makes no objection to the June of 2009 RFC assessment performed by Dr. Caviness, who made almost identical findings. Although the ALJ accorded Dr. Caviness's opinion lesser weight, the two RFC assessments both find that Plaintiff is capable of a light level of exertion. The undersigned therefore finds no merit to this argument.

**C.  The ALJ properly found that Plaintiff did not meet Listing 1.04**

Plaintiff argues the ALJ erred in finding that her cervical spinal stenosis did not meet the criteria for Listing 1.04. At step three of the sequential evaluation process, the ALJ must determine whether the claimant has a medical condition that satisfies the criteria of a listed impairment. *See* 20 C.F.R. § 416.920(a)(4)(iii); 20 C.F.R. pt. 404, subpt. P, app. 1. These listed impairments are considered severe enough to justify a presumption of disability. *See* 20 C.F.R. § 404.1525(a) (providing that the listed impairments found in appendix 1 of subpart P are those impairments "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience"). The listings are designed to reflect impairments that, for the most part, "are permanent or expected to result in death." 20 C.F.R. § 404.1525(c)(4). If a listed impairment is not expected to result in death, and does not state "a specific period of time for which your impairment(s) will meet the listing," then the evidence must show that the impairment "has lasted or can be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1525(c)(4); *see also* 20 C.F.R. §§ 404.1509, 1525(c)(3); Castro v. Astrue, No. 8:08-CV-769, 2009 U.S. Dist. LEXIS 57893 (M.D. Fla. July 8, 2009) (adopting recommendation of magistrate judge noting that the criteria of Listing 1.04(A) cannot be satisfied intermittently, but must be satisfied over a period of 12 months). The claimant has the burden of proving that an impairment meets the criteria of a Listing. Bowen v. Yuckert, 482 U.S. 137, 146,

n.5 (1987). A claimant's impairments must satisfy all the requirements of the Listing. <u>Sullivan</u>

<u>v. Zebley</u>, 493 U.S. 521, 530-31 (1990). An impairment that meets only some of the Listing's

requirements "no matter how severely, does not qualify." *Id.*; *see also* <u>Hays</u>, 907 F.2d at 1457-58.

Section 1.04 contains three subsections. The introductory paragraph to § 1.04 requires a

claimant to show the following for all of the subsections: a claimant must suffer from either a

herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc

disease, facet arthritis or vertebral fracture, resulting in compromise of a nerve root or the spinal

cord. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04. Additionally, to meet the requirements of

section 1.04(A), a claimant must show evidence of nerve root compression characterized by

neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by

sensory or reflex loss and, if there is involvement of the lower back, positive straight leg raise

testing. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A).

Here, the ALJ found that

> Listing 1.04 requires that a claimant experience sensory or reflex loss, spinal
> arachnoiditis resulting in a need to change position more than once every 2 hours,
> or lumbar spinal stenosis resulting in an inability to ambulate effectively. There is
> no indication in the medical evidence that the claimant has experienced significant
> sensory loss, and physical examinations show that the claimant's reflexes are
> normal (Exhibits 10F, 13F). Further, a straight leg raise test was negative (Exhibit
> 15F), and the record contains no documented findings of spinal arachnoiditis.
> While images of the claimant's spine show cervical stenosis, a CT scan of the
> claimant's lumbar spine showed no nerve root impingement or significant spinal
> stenosis (Exhibit 10F). At the hearing, the claimant testified that she uses a lower
> lumbar back brace but is able to wash dishes, travel to the post office regularly, and
> perform basic household chores. Physical examinations show that the claimant
> walks with a normal gait (Exhibit 13F). Further, the claimant's description of her
> daily activities indicates that she retains the ability to ambulate effectively. The
> claimant's back impairment therefore fails to satisfy the requirements of listing
> 1.04.

(T.p.46). Plaintiff argues there is evidence in the medical record to show cervical spinal stenosis

accompanied by compression of nerve roots, loss of range of motion, and sensory loss. With regard to sensory loss, during Plaintiff's visit on October 29, 2009, Dr. Huffmon noted she had decreased sensation circumferentially in her right upper and right lower extremities. However, this is the only objective medical evidence in the record to indicate sensory loss. The medical record otherwise reflects intact sensation for Plaintiff. The ALJ could therefore properly conclude that this single incident of decreased sensation did not constitute significant evidence of sensory loss, and that Plaintiff therefore failed to carry her burden of demonstrating that her cervical spinal stenosis met the criteria for Listing 1.04. This assignment of error is accordingly overruled.

IV.    **CONCLUSION**

For the reasons discussed above, it is RECOMMENDED that Plaintiff's motion for judgment on the pleadings (DE-36) be DENIED, that Defendant's motion for judgment on the pleadings (DE-38) be GRANTED, and that the final decision by Defendant be AFFIRMED.

Objections to this Memorandum and Recommendation must be filed by the parties no later than Monday, March 19, 2012. Any response to an objection must be filed no later than Friday, March 23, 2012.

SO RECOMMENDED in Chambers at Raleigh, North Carolina on Monday, March 05, 2012.

_____
WILLIAM A. WEBB
UNITED STATES MAGISTRATE JUDGE